The next case on the argument calendar today is Lulea v. Barr, number 19-2. Good morning. May it please the Court, Michael P. DiRamundo for the respondents. For the petitioner herein, it's Mr. Lulea. He's actually sitting in the front row of the Court to the left of the Court. This started with the cancellation case, cancellation of removal, which one has to prove 10 years of continuous physical presence in the United States, good moral character, and outstanding unusual hardship to a qualifying relative that must be a U.S. citizen. In this case, it's their daughter, who is D'Andra, who was 3 years old at that time when this started. The whole case boils down to the 10 years. Yes, Your Honor. Judge Walker. Why don't we focus on that? Yes. I would state, Your Honor, Judge, that this is a little strange because the case was originally started by Judge Vomacher. I was a trial attorney below. We had about seven hearings before Judge Vomacher. The major one was on May 2, 2012. Isn't the question — let's boil it down to the fact of in terms of the exception to the 10 years requirement, which is the 180 days, the total time, and we know about the trips to Romania. We know about the three trips to Romania, which is about 54 days, as I recall. Correct, Judge Walker. And then you've got the balance of that period, and the question is how many of those days were out of the country? And your client is saying very few because they were on a vessel — he was a crewman on a vessel traveling between U.S. ports and — or U.S. territory ports, and, therefore, that time should not be counted against him, except to the extent that he was — he took these trips to Alaska, and I think it was a total of six weeks involved there, 42 days? We estimated 42 days, Your Honor. Yes, he said they went through the — they traveled from Florida through the Panama Canal up the coast of — the west coast of the United States to Los Angeles, Seattle, and then into Alaska, and he would port for three to four months in Alaska. That was all within the continental waters of the United States. So we estimated, based on his credible testimony, it was approximately 42 days. The IJ reached a different conclusion and said basically that he was at sea this whole time. We don't know whether it was international waters, the burdens on your client, to show that he was in the U.S. during that time, and, therefore, we're going to just kind of draw an inference against him on that. That's correct. That's correct, Judge Walker. And so the question comes down, to my mind, is to how precise one has to be. Does he actually get maybe a presumption in his favor when he's going between U.S. ports? Because he could stay within the U.S. waters. The ships could stay within the U.S. waters. They don't necessarily have to go out. But even if they do go out, he's on a vessel between U.S. ports. Should that really count as being abroad when he's on such a vessel that's capable of going? And none of this was addressed carefully by the immigration, by the BIA or the IJ, right? That's correct. You're asking for a remand so that they can focus on this. Yes, and I think because, Judge Walker, Judge Vomack's main thrust and concern was whether or not we could tack on time from 1997 to May of 2000 when he got his B-2 visa. The B-2 visa from May 2000 to May 2007, 54 days. We know that. It's the time before that, that three years. And I think Judge Vomack, in my own personal opinion, was that he was comfortable with the 10 years, but he didn't believe that we could tack on the time from May 1997 to May 2000. So when Judge Loprest takes over the case, we have no status conference. We have no idea that he takes over this case. And Judge Vomacker is still on the bench. He doesn't retire for another year. He goes to a different focus. Yeah. Completely different focus that we were not focused on before Judge Vomacker. So that's why I think the regulation comes into play that it should stay with the judge unless the judge is unavailable or retires. I disagree with you on that. You still have an argument that the judge's application was imprecise, to say the least, about whether he was abroad or not during the period of time that he sort of credits the government prior to 2000, right? Correct. Correct, Your Honor. Am I right in understanding also that he was employed by the same U.S.-based carrier, Princess Line, during that time? The entire three years. The entire time. And he had a residence in Florida during that time. He had a residence in Florida. Yes, residence in Florida. When he went to Alaska, he would stay in port for three to four months, which, again, should be considered within the continental United States. Do you know what flag of the Princess, of the ships were that he was on? I didn't hear you, Judge. I'm sorry. Was it a U.S.-based flag or Liberian or some other? You don't know. It's not in evidence. It didn't come in in evidence at all. Your client, I mean, one of the things that struck me as, you know, somewhat unusual about this case, your client was a crewman on this ship, and it seems to me that the ten-year, you meet the, he's very vague about where he is stopping, so a cruise ship from Florida going to the Panama Canal, according to your calculations, is never stopping at Caribbean Islands, which strikes me as rather implausible. Well, Judge Parker, he's going the other direction, basically. From Florida through the Panama Canal. Up the coast. Up the west coast. Don't you allege, though, in part, that even if it did stop in the Caribbean Islands, because I was struck by the same thing as Judge Parker, that he did not get off the ship then, because that's, the crew is not at liberty the way guests are to roam in their ports of call. That's correct, Judge Parker. Is that correct? That's correct. If there was a stop outside of a U.S. port in one of these Caribbean Islands, it was just to pick up and discharge passengers. Yes, Judge Walker. It wasn't like they were there for three weeks sitting in Barbuda or someplace. No, and he wasn't even sure he traveled through the Caribbean Islands. There were three to four trips that went to Puerto Rico that were for a day, basically. And he talked about the fact that there was a casino on board and there was basically to gamble on the ship. Most of the time he was in port at Florida, and he stayed within the continental waters of the United States. But we never focused on that during the trial. We had one day of this, it's eligibility, really. We only got to eligibility. I kept asking Judge Volmecker to do the full hearing. We never got to that point. We stayed focused on the eligibility. But it was always on the tack-on time, which the board has acquiesced on and didn't decide. When you were remanded to the IJ through the BIA, what would you do that was different? I would focus completely on the trips. I would see if there's any other information we can get from the Princess lines with respect to those. We had only five appraisal forms. Three of them were for Alaska. Two of them we weren't sure what they were. They were short ones. I think they were probably to Puerto Rico. He didn't travel many trips. It's only three years, basically. And the three big trips were the summers from- Always on the same ship? Three different cruise ships. Three different ships. All with the same lines. Presumably there would be logs and you would have that information as to where they went. Yes. What's your position on whether when a ship is traveling between U.S. ports, Los Angeles to Seattle, perhaps, or Alaska, between U.S. ports, whether that is capable of being time spent abroad? My position would be that it would be time in the United States. There's 200 miles within the continental U.S. border that they could stay. I thought the territorial seas of the United States was 12 miles. I thought it was 200. Some countries have 200. Again, I would state that they were always within the continental United States, but, again, that never came up at the original eligibility hearing. It certainly could have been, and why should that be used against your client, who is traveling on a ship between U.S. ports, is another way of looking at it. Yes. Thank you. Very good. You have two minutes of rebuttal. We'll hear from the government. Thank you, Judge Cohn. Yes. May it please the Court, my name is Andrew O'Malley. I represent the Attorney General of the United States. The Court should deny the petition for review because Mr. Lulia failed to demonstrate the requisite 10 years of physical presence for cancellation of removal and similarly failed to demonstrate any error in the replacement of the original petition. He would get the time prior to 2,000 counts, right, if he can show that he was in the U.S. and wasn't abroad more than the requisite number of days. The agency assumed that it counts here. They didn't get into the issue of whether or not he can actually tack on that time after coming in on a B-2 visa. All we're talking is continuous residence. No, U.S. presence, Your Honor. I mean, I'm sorry, U.S. presence. That's correct. And it's continuous except for these exceptions that we know about, right, 180 days. That's correct, except for the trips to Romania. Why would it matter what his status was at the time of 2,000 or before 2,000? Well, because Congress has barred Crewman from receiving cancellation of removal. No, I understand that part, but in terms of the actual residence in the United States or not? In terms of his physical presence? Physical presence. I'm sorry. I'm not sure I quite understand. Why should the question of physical presence turn on what the difference between his Crewman's status and his student visa status? Oh, it doesn't turn on that right now, Your Honor. Okay. We're all accepting the fact that the three years before 2,000 would count if he could show that he was physically present in the United States. For purposes of this appeal, yes. Of course, the Board didn't go down that thorny path, and I don't think it needed to because he can't show the presence here. And what is the government's position on the territorial seas of the U.S.? Twelve miles? Yeah, 12 miles. It explains that territorial boundaries or external limits is 12 miles. Okay. And in terms of – and so if the ship that he were a Crewman on went outside the 12-mile boundary, even though his passport isn't stamped or his – whatever ID he has doesn't go through any acknowledgment of that departure, that the government's position is that that would constitute a break in continuous presence? Is that right? Yes, Your Honor. In fact, physical presence is bodily presence. We see – you don't see this very often in the cancellation or removal context, mainly because I think Crewmen are barred from it. But we do see it in other areas. For example, deriving citizenship from an alien parent and a U.S. citizen parent born abroad. The consular information shows that time spent on a ship outside the territorial waters does not count towards physical presence. But really, I don't understand why that makes sense. When a person is – has a residence in the United States, is employed by a U.S. company, is traveling on a U.S. ship as a worker, perhaps can demonstrate that he did never debarked from the ship. The fact that the ship got blown over to the 12-mile boundary for, you know, 15 minutes, why should that count against the concerns that support the continuous residence requirement in the first place? For the continuous physical presence, Your Honor, this is a – I'll say the cancellation or removal is an extraordinary remedy. The requirements are very strict. And the physical presence requirement is one of those requirements. And we know that Congress made it strict. And we know that Congress knew – But not irrational. This is nothing – nothing within his control. I mean, he wanted to stay – he would obviously prefer now in hindsight to have stayed within the territorial waters. The ship's captain decides to take a different route. Or the ship, as my colleague has pointed out, or the ship is blown off course. Why should that be adverse to the alien? Well, again, Your Honor, I think it goes back to this is an odd circumstance of crewmen where I know that Congress does not want alien crewmen to receive cancellation of removal, so it shouldn't count in that context towards physical presence. But as I was saying, we know that when Congress wanted to count it towards physical presence, they specifically said so. They did so in 8 U.S.C. 1441 for armed service members on U.S.-flagged vessels traveling in international waters. That's constructive physical presence. They did not do so here. I'd also like to note that we don't know if he was simply traveling between U.S. ports. His testimony was a little vague on everything, but specifically as to where he went. Yes, he testified that he went to Alaska and that he went to Puerto Rico. When was he testifying? What year was he testifying? Well, his affirmative testimony went to his first documented trip, which was June 15th. No, but I'm talking about the date of the trial. It was May 2012. We're talking about a person testifying in 2012 as to the course of as to what happened on ships, and he kept no records and so forth more than 12 years before, between 12 and 15 years earlier. And so his testimony wasn't precise as to whether he was in territorial waters, what particular ports they stopped in or not. He had a general recollection of the purpose of the voyage and the various U.S. ports along the way. He also had testimony that traveling to Alaska from Florida took about a week, and there were six of those trips, presumably, three up and three back. Correct? Yes, Your Honor. I don't know if it was about a week. That's what I think is said at briefing. But he also said he stopped in ports along the way for three days and four days, three days in Los Angeles. Right. So I'm not sure how it took a week to get to Alaska. Well, I don't know. But the problem is that, and Your Everserve is pointing out, that that really wasn't the focus of the trial. It was, Your Honor. It was. It absolutely was. The focus of that hearing was specifically for the continuous presence requirement. That was it. The immigration judge says we are going to focus this hearing on this requirement, and then we go forward on the other requirements for cancellation of removal if we need to. They did not need to. I will note his testimony is we've got these four trips. But he also said ships could pick you up. But you disagree with Your Everserve. I do. Ships could pick you up at the back end of a trip and take you on another journey to other ports. He did not know if he traveled outside the United States ports. He didn't know if he went to the Caribbean. He didn't know if he went to South America. He did not know where he was or when he was there. And with this strict requirement, a heavy burden for cancellation of removal, this extraordinary remedy, he simply did not meet that burden. With respect to the immigration judge replacement issue, I simply note that this is not a jurisdictional issue. He has no right to a specific immigration judge. The errors that are pointed out in the immigration judge's decision I don't think are actually errors. I think they're just not reflected in the record. But there's certainly nothing material that was pointed out here that would affect the outcome of the decision. I would like to reemphasize the fact that his testimony was vague as to where he was. It was vague as to whether or not he traveled outside U.S. ports. He did not give us any information. Was he found to be incredible? He was not found to be incredible, Your Honor, no. But this Court has to find compelling evidence that he met his burden of proof. And there's nothing in this record he can point to that compels the conclusion that he met his 10 years of continuous physical presence. Okay. Thank you very much. Thank you. Mr. DiRamondo, you have two minutes of rebuttal. Thank you, Your Honor. This really comes up on eligibility. There's very few reported cases. The one case that was cited by the immigration judge was a matter of GDM. The Board hasn't reached or acquiesced with respect to whether we could tack on time. The whole focus of the eligibility hearing, again, was whether we could tack on the time from May 1997 to May of 2000. It wasn't anything else. It wasn't going through the trips. I think Judge Vomacker was satisfied with the 10 years, actually. And if the Court looks at the ---- I do think that. But your adversary is saying that that was the focus of the litigation and that you failed to prove your case. I agree with eligibility, Judge Walker, being the main focus. But the main focus was a tack on time. And I would point the Court to the record at 197. Yes. It was basically only that. I think Judge Vomacker was satisfied with the 10 years. He had a problem with tacking on the time because Mr. Lulia was a crewman in 1996. And in my opinion, he said we can't tack on time because once you're a crewman, you're always a crewman. But the Board decision begs to differ. And the Board could have easily disposed of this case by saying he's not eligible. They didn't do that here. So we don't have that issue before this Court. But it's whether or not he was found credible and he made out his 10 years. And did it fall within the 90-day one-trip exclusion? Or did it total 180 days? He was found to be credible by Judge LaPrest. He wasn't even the trial judge. I think there's a reason for doing that because you don't want cases being switched after testimonies being taken to a judge that is still available. But we're stuck with this record at this point. of the facts prior to 2000 than your client did, right? Absolutely, Judge Walker. And so, you know, you think your client made out a case. The judge found something different. And the only real question is whether the judge was appropriately following the rules as far as, in my mind anyway, as far as whether he was in territorial waters or not territorial waters. And that issue didn't even come up really, Your Honor. You know, he testified that he stayed within the coast of the West Coast most of the time and he was within territorial waters. We'd ask for a remand in this case. I think there would be a different approach if it goes back. He's been here now for 24 years, has a 16-year-old daughter. The hardship to the U.S. citizen daughter is huge. She's in high school at this point. We never even reached that issue. So it's really the outstanding and unusual hardship to the U.S. citizen child. Thank you very much for your time. Very much. Thank you both. And I will reserve decision.